IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVID A. PEREZ, SR.,  TONY B. VIGIL,
HAROLD PORTER and JAMES D. PORTER,

   Plaintiffs,

vs.               Civ. No. 03-361 JP/LFG

T. GLENN ELLINGTON, in his individual
capacity; JAMES BURLESON, in his
individual capacity; DAVID FERGESON, in
his individual capacity; RICKY A. BEJARANO,
in his individual capacity; and JAVIER LOPEZ,
in his individual capacity,

   Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

On April 1, 2004, the Defendants filed Defendants' Motion for Summary Judgment (Doc.

No. 92).  On June 23, 2004, the Court heard arguments by counsel regarding the motion.  Having

reviewed the briefs and relevant law and having considered counsel's arguments, the Court

concludes that the Defendants' Motion for Summary Judgment should be granted in part and that

with the exception of the Plaintiffs' First Amendment claim, the Plaintiffs' claims should be

dismissed with prejudice.

A.  Background

   The Plaintiffs are Native Americans from Nambé Pueblo.  During 2000-2001, Plaintiff

Perez was Governor of Nambé Pueblo and the other Plaintiffs were members of the Nambé Tribal

Council.  The Defendants are T. Glenn Ellington (at all relevant times the Secretary of the New

Mexico Taxation and Revenue Department (TRD)), James Burleson (at all relevant times the

Deputy Secretary of the TRD), Ricky Bejarano (at all relevant times the TRD Director of the

Audit and Compliance Division), David Fergeson (at all relevant times the TRD Deputy Director

of the Audit and Compliance Division), and Javier Lopez (at all relevant times staff legal counsel

for TRD).  The Plaintiffs base this lawsuit on the following contentions: 1) on February 11, 2002,

Defendant Ellington through Defendant Burleson and upon the advice of Defendants Bejarano,

Fergeson, and Lopez illegally issued jeopardy assessments of over $4.6 million against each

individual Plaintiff to collect gasoline excise taxes and petroleum products loading fee taxes, 2)

Defendant Bejarno untimely abated the jeopardy assessments, and 3) Defendant Bejarano

untimely released the liens that resulted from the jeopardy assessments.

Unless otherwise noted, the following facts are undisputed.  "If the [TRD] secretary at any

time reasonably believes that the collection of any tax for which a taxpayer is liable will be

jeopardized by delay, the secretary may immediately make a jeopardy assessment of the amount of

tax the payment of which to the state the secretary believes to be in jeopardy."  NMSA 1978, §7-

1-59(A) (1965).[1] Under TRD Jeopardy Assessments Guidelines dated October 1995:

> A jeopardy situation may exist when the Department has reason to believe that action
> contemplated by the taxpayer would jeopardize the collection of taxes.  This could include
> moving from New Mexico and/or removing assets from the State.  Other determining
> factors might be knowledge of pending liquidation sales or intentions to file bankruptcy.

To request a jeopardy assessment, the requestor must prepare an action request and annotate the

pertinent information in the CACS (a computerized system) history text or on a tickler sheet in

the taxpayer's file.  TRD Jeopardy Assessments Guidelines (Oct. 1995).  Then, a taxpayer file

folder is prepared and copies of the action request and supporting documentation are inserted into

---

[1]Additionally, NMSA 1978, §7-1-72.1 (1997) states that "[a]ny person other than the
taxpayer who willfully causes or attempts to cause the evasion of a taxpayer's obligation to report
and pay tax may be assessed a civil penalty in an amount equal to the amount of the tax, penalty
and interest attempted to be evaded."

the taxpayer folder. *Id*. Since 1997, the TRD has issued 39 jeopardy assessments.

Nambé Pueblo is the sole shareholder of the Nambé Pueblo Development Corporation (NPDC), a federally chartered tribal corporation. Only the NPDC's governing board can act on behalf of the NPDC. The NPDC is a registered gas distributor allowed to claim the gas tax deduction provided by NMSA 1978, §7-13-4(F) (1991). Section 7-13-4(F) states that the following "gasoline may be deducted from the total amount of gasoline received in New Mexico during the tax period":

> gasoline received in New Mexico and sold by a registered Indian tribal distributor from a nonmobile storage container located within that distributor's Indian reservation, pueblo grant or trust land for resale outside that distributor's Indian reservation, pueblo grant or trust land; provided the department certifies that the distributor claiming the deduction sold no less than one million gallons of gasoline from a nonmobile storage container located within that distributor's Indian reservation, pueblo grant or trust land for resale outside that distributor's Indian reservation, pueblo grant or trust land during the period of May through August 1998; and provided further that the amount of gasoline deducted by a registered Indian tribal distributor pursuant to this subsection shall not exceed two million five hundred thousand gallons per month, calculated as a monthly average during the calendar year. Volumes deducted pursuant to Subsection E of this section shall not be deducted pursuant to this subsection.

On January 4, 2001, Delese Dellios on behalf of Gasplus (a non-Native American company), the Plaintiffs, and John Perez, Jr. entered into a management agreement in which Gasplus agreed to manage, supervise and operate Nambé Pueblo's gas distribution business in exchange for monetary compensation.[2] At that time, Plaintiff David Perez was the governor of Nambé Pueblo and the other Plaintiffs were tribal councilmen. The Plaintiffs apparently were not satisfied with the performance of the previous gasoline distribution contract with Namtex. The Plaintiffs and John Perez, Jr. (also a tribal councilman at that time) believed that they were acting

---

[2]Gasplus was doing business under the management agreement as "Nambé Gas." The TRD knew that the NPDC acted under the name of "Nambé Gas."

on behalf of Nambé Pueblo when they entered into this management agreement with Gasplus because they constituted a majority of the tribal council.  In fact, the Nambé Pueblo Council had previously approved entering into a management agreement with Gasplus in October 2000 and then dissolved the NPDC governing board in November or December 2000 partly as a result of problems with the Namtex contract.  Once the NPDC had a new governing board, Plaintiff Perez, as Governor of Nambé Pueblo, asked the NPDC to take over the gasoline distribution business in 2001.  During 2001, Gasplus reported to the TRD on behalf of Nambé Gas the amount of gasoline sold through its tanks by the independent non-Native American gasoline distributors.  The gasoline distributors actually took the §7-13-4(F) gasoline deduction, not Nambé Pueblo, the Plaintiffs, or Gasplus.

Ken Newton, a non-Native American, ostensibly ran Gasplus although his three daughters (Delese Dellios, Gina Newton-Yarber, and Kenna Newton Bolan), all non-Native Americans, officially acted on behalf of Gasplus.  Mr. Newton, through another company known as Quantum Entertainment, Ltd. (QEL), had previously entered into a gasoline distribution agreement with Santo Domingo Pueblo.  This gasoline distribution agreement involved a "bump and run" scheme in which Mr. Newton sent gasoline trucks onto Santo Domingo Pueblo land, without transferring the gasoline to the tribe, in order to illegally take advantage of tax breaks intended for tribal gasoline.  TRD brought this "bump and run" scheme to a halt through litigation in 1999 although the Santo Domigo Pueblo's gasoline distribution corporation, Kewa Gas, Ltd., had to pay TRD approximately $180,000 in back taxes.

In January 2002, at the request of State Representative Robert Burpo, Defendants Ellington and Burleson met with newly elected Nambé Pueblo Governor Tom Talache and Nambé

Pueblo Lieutenant Governor Shannon McKenna.  Governor Talache complained that gasoline revenues were down and that he was unable to gain access to the books or records of Gasplus to investigate the reason for the lower gasoline revenues.  Governor Talache explained that prior to his taking office, the Plaintiffs and John Perez, Jr. had entered into an agreement with Mr. Newton to establish a gasoline distribution joint venture.  Governor Talache, presumably, was referring to the Gasplus management agreement.  Governor Talache asked if the TRD would audit the Pueblo's books with respect to Gasplus because Nambé Pueblo did not have the funds to hire a private auditor.  Governor Talache noted that when the NPDC had a distribution contract with Namtex, gasoline revenues were substantially higher than the revenues received under the Gasplus management agreement.[3]  Governor Talache also believed that the Gasplus management agreement was not legal and stated that the Bureau of Indian Affairs (BIA) was investigating the legality of the agreement.

Governor Talache and his supporter Herbert Yates are members of a Nambé Pueblo political faction opposed to the Plaintiffs.[4]  Defendant Ellington knew at the time of the January 2002 meeting with Governor Talache that there was factional animosity at Nambé Pueblo between Governor Talache and the previous Nambé Pueblo administration which included the Plaintiffs.   At an earlier time, Plaintiff Harold Porter had asked Defendant Ellington to conduct an audit of the Nambé gasoline distribution business to investigate a "bump and run" scheme during a period when Mr. Yates had operated the business.  At that point, TRD only conducted a partial

---

[3]Contrary to Governor Talache's assertions, Nambé Pueblo actually received $200,000 more in gasoline revenues in 2001 than in 2000.

[4]The Talache/Yates faction in March or April 2004 apparently obtained copies of the depositions given by the Plaintiffs in this case and made those depositions public.

investigation.

Furthermore, Defendant Ellington was aware of Mr. Newton's "bump and run" scheme at Santo Domingo Pueblo at the time of the January 2002 meeting.  Consequently, Defendant Ellington was not surprised that Mr. Newton was behind the Gasplus management agreement and that Governor Talache, Lt. Governor McKenna, and the BIA questioned the legitimacy of the Gasplus management agreement.  Defendant Ellington, therefore, agreed to conduct an audit of the Gasplus records.

In January 2002, the New Mexico State Legislature was concerned about discrepancies in the reporting of gasoline amounts required under §7-13-4(F).  Accordingly, Defendant Bejarano was concerned about auditing the gasoline amounts reported by Gasplus and the gasoline amounts being transported by the independent gasoline distributors for Gasplus.  The Defendants believed an audit of Gasplus might be difficult to conduct because the Plaintiffs could invoke tribal sovereign immunity and thereby prevent the Defendants from obtaining the Plaintiffs' financial records necessary for an audit. However, by issuing jeopardy assessments the Defendants would obtain access to the Plaintiffs' financial records.

Sometime near the end of January 2002, Governor Talache, Nambé tribal counsel, BIA counsel, and the BIA regional director informed Defendant Lopez at a meeting that the Gasplus management agreement was invalid because the entire tribal council did not sign the Gasplus management agreement.  On February 4, 2002, Defendant Ellington attended a meeting convened by the BIA regarding the legality of the Gasplus management agreement.  The BIA personnel explained that they were about to issue a letter informing all of the interested parties that, in the

opinion of the BIA regional director, the Gasplus management agreement was invalid because Gasplus was improperly encumbering reservation land.  Only the NPDC can encumber reservation land.  At that time, Defendant Ellington understood from either Governor Talache or Mr. Yates, then chief executive officer of NPDC, that the tribal council had not ratified the Gasplus management agreement.

On February 7, 2002, the BIA issued a letter opinion concluding that the Gasplus management agreement was invalid because Gasplus was not authorized to encumber reservation land and that the Plaintiffs and John Perez, Jr. were not authorized to act on behalf of the NPDC in transferring the NPDC lease for gas terminal facilities to Gasplus.  The BIA then demanded that Gasplus vacate the NPDC terminal facility, advise employees to report to Mr. Yates, return petty cash to Mr. Yates, return items to Mr. Yates which would give Gasplus employees access to or control over the facilities, transfer books and records to the NPDC, return all proceeds, place all bank accounts in the name of NPDC, refrain from withdrawing from these bank accounts, and repay management fees for the past year.  The Secretary of Interior subsequently affirmed this decision.

Also on February 7, 2002, the TRD and Nambé Pueblo through Governor Talache entered into a Joint Powers Agreement and Information Sharing Agreement (Joint Powers Agreement). The Joint Powers Agreement provided that both the TRD and Nambé Pueblo had the authority to disclose

> information of fuel taxes (gasoline and special fuel excise tax) and gross receipts taxes. Information concerning other tax programs will be disclosed if it is related to gasoline, special fuels or gross receipts taxes, or if disclosure of such information is necessary for either party to enforce or collection [sic] gasoline, special fuel, or gross receipts taxes.

Joint Powers Agreement at 1. The Joint Powers Agreement noted that "both governments have in place statutory provisions that protect the confidentiality of information contained in tax returns and protect information about taxpayers obtained by employees or agents of the parties through the performance of their jobs." *Id.* The TRD, however, did not investigate whether Nambé Pueblo actually had the requisite confidentiality protections.

On February 8, 2002, Defendant Fergeson issued a report after having reviewed monthly certified Indian Tribal Distributor Reports, Gasplus' Distributors Gasoline and Ethanol Blended Fuel Tax Reports filed on behalf of NPDC, the Gasplus management agreement, and the February 7, 2002 BIA letter. Defendant Fergeson found that:

> The deductions taken under the ID#02-267500-000 are disallowed because the entity taking the deduction pursuant to Section 7-13-4(F) was not a certified Indian distributor. In addition, the contract between Gasplus, LLC, and Nambé Pueblo is invalid, which means the individuals who entered into this contract acted in their individual capacity. As a result, they are individually and severally liable for the taxes owed on the fuel purchased.
>
> Gasplus, LLC was aware that the entity taking the deductions was not a Certified Indian Tribal Distributor as required by Section 7-13-4(F), yet continued to prepare and submit monthly fuel tax reports claiming and taking the deductions. As a consequence of Gasplus's preparation and filing of false fuel tax reports, it is liable for a civil penalty in the amount of taxes that went unpaid, pursuant to Section 7-1-72.1.

Exhibit B (attached to Affidavit of T. Glenn Ellington (Doc. No. 36), filed Oct. 29, 2003.

Having reviewed the February 7, 2002 BIA letter, Defendant Fergeson's February 8, 2002 report, and other conclusions reached by TRD staff, Defendant Ellington determined the following:

> a.     Mr. Newton, acting out of a desire to participate in the economic fruits offered to Indian sovereigns by §7-13-4(F), created a New Mexico corporation known as "Gas Plus" and was careful to avoid using his own name in any of the corporate papers.

b.    As a result of an ongoing political fight within the Nambé Pueblo, Mr. Newton could not or did not want to deal with Nambé Pueblo Development Corporation.  I felt that the parties to the Gas Plus agreement were hoping that no one would bring the fact that the "Management Agreement" was executed by an entity other than NPDC to the attention of the BIA, the State of New Mexico, or other legal authorities.

c.    The tax deduction taken on these sales was invalid.  Accordingly, the amount of money which should have been paid to the State of New Mexico on these transactions was owed to the State by anyone and everyone who was associated with the Gas Plus scheme.

d.    Based on TRD's past experiences with Mr. Newton, I was fearful that if the Taxation and Revenue Department did not aggressively pursue the monies it was owed, those funds would be dissipated and/or rendered non-traceable.

e.    I believed that what would normally be a legitimate economic development benefit for the Pueblo had been placed in jeopardy due to the impropriety of the Gas Plus arrangement.  It was important that the Taxation and Revenue Department do all in its power to freeze all the funds generated by the Gas Plus arrangement in order to secure the payment of more than four and one half million dollars in taxes owed the State of New Mexico.  I knew that the federal government was investigating the issue and it would probably make a tax claim of its own, which would take legal precedence over the State's tax claim if first perfected.

Affidavit of T. Glenn Ellington at ¶17, filed Oct. 29, 2003.  Defendant Ellington, however, later admitted in his deposition that Defendant Fergeson incorrectly determined that the Plaintiffs were individually liable simply because the BIA found that the Gasplus management agreement was invalid.

On February 8, 2002, Defendant Ellington informed Governor Talache by letter that "[i]t appears that a group of individuals in conjunction with Gasplus, LLC, a limited liability company, have purchased and sold gasoline using the name and tax identification number belonging to Nambé Pueblo Development Corporation (NPDC) without that corporation's authority."  Exhibit D (attached to Affidavit of T. Glenn Ellingtion, filed Oct. 29, 2003).  Defendant Ellington also

stated that

> NPDC is the registered Indian distributor certified to claim and take the deduction allowed
> by Section 7-13-4(F).  However, NPDC is not a party to the agreement between Gasplus
> and the Pueblo of Nambé.  In addition, the Department has been informed that the
> agreement itself between Gasplus and the Pueblo is invalid.  Because they were acting
> without authority from NPDC or from the Pueblo of Nambé, the individuals who
> contracted with Gasplus were acting in their individual capacity and are thus directly liable
> for the unpaid taxes.

*Id*.  Defendant Elllington ended his letter to Governor Talache by informing Governor Talache

that the TRD was evaluating whether to decertify NPDC to prevent gasoline tax evasion

problems.  Defendant Ellington, however, imposed the following conditions on Nambé Pueblo in

order to prevent decertification of NPDC:  1) inform the TRD of management contracts with

other entities; 2) inform the TRD "how NPDC intends to operate its wholesale fuel distribution

business;" and 3) not "allow any person who already owes unpaid fuel tax to the state of New

Mexico to participate in the operation of the Pueblo's fuel distribution enterprise."  *Id*.  Nambé

Pueblo has abided by these conditions.

Prior to determining whether to issue jeopardy assessments instead of regular tax

assessments, Defendant Ellington discussed the issue with Defendant Lopez, Defendant Fergeson,

Defendant Bejarano, and Assistant Attorney General Jack Hiatt.  Matters considered by the

Defendants included the fact that Mr. Newton was effectively in control of Gasplus and attempted

to insulate himself from liability by using his daughters as alter egos; Mr. Newton had prior tax

difficulties with the Santo Domingo Pueblo involving matters of a misleading nature; Gasplus was

doing business under the name "Nambé Gas," a name which could mislead a person into believing

that it was a legitimate tribal commercial enterprise; Gasplus refused to allow Governor Talache

to inspect its books of account and business records; Plaintiff David Perez instructed Los Alamos

National Bank officials to refuse Governor Talache access to Gasplus bank records; the federal government could claim an interest in taxes owed by Gasplus before TRD could claim an interest in those taxes; and all or some of the parties to the Gasplus management agreement might move funds in an effort to secrete funds.  Defendant Ellington decided to issue the jeopardy assessments against the Plaintiffs as well as against Mr. Newton's daughters based on the above considerations.[5]

These jeopardy assessments were apparently issued without the required action request form or tickler sheet. Moreover, TRD had no evidence that the Plaintiffs had profited personally from the Gasplus management agreement or that they would be moving Gasplus assets.  TRD also had no evidence at that time that either the Plaintiffs or Gasplus "received gasoline in New Mexico" and so were subject to §7-13-4(F) gasoline deductions.

On February 12, 2002, Governor Talache sent a Memorandum to the Nambé Pueblo residents regarding the recent actions concerning Gasplus.  Governor Talache noted that the State of New Mexico would hold the Pueblo and the NPDC harmless for the taxes owed by Gasplus. The Pueblo also froze the Gasplus bank account at Los Alamos National Bank and issued a temporary restraining order to the principals of Gasplus to prevent them from removing or destroying records which TRD intended to audit.

On February 13, 2002, Defendant Lopez and Linda Palmer (a TRD certified public accountant) met with Ms. Dellios and Gasplus attorneys regarding the jeopardy assessments. Defendant Lopez and Ms. Palmer arranged to conduct a field audit at the offices of Gasplus in

---

[5]Defendant Burleson signed the jeopardy assessments as a ministerial matter because Defendant Ellington was not in the office on February 11, 2002.

Albuquerque the following day.  Ms. Palmer found that the Gasplus office consisted of a Quicken

software program at Ms. Dellios' residence.  Ms. Dellios was apparently not completely

cooperative in answering questions posed by the TRD officials.  Ms. Palmer asked Ms. Dellios

about substantial amounts of money Gasplus paid to QEL in January and February 2002.  Ms.

Dellios responded to Ms. Palmer by stating that Gasplus owed QEL that money.  Ms. Dellios

failed to mention that QEL is controlled by her father, Mr. Newton.  Substantial sums of money

were also transferred from the Gasplus Los Alamos National Bank account between January 28,

2002 and February 13, 2002 to Mr. Newton's daughters.  In addition, the Gasplus account with

Los Alamos National Bank was closed during this time and the monies transferred to a new

account at Los Alamos National Bank and to a new account at New Mexico Educators' Federal

Credit Union.  Ms. Dellios explained that these money transfers were necessary because Gasplus

was afraid that the TRD would freeze its account and the monies which Gasplus needed to carry

on its business.

On February 14, 2002, Defendant Lopez told Samuel Tuma, Plaintiffs' attorney, that the

TRD wanted to review Plaintiffs' personal bank records for the last two years and would not levy

on the Plaintiffs' property if the Plaintiffs produced those bank records.  Although the Plaintiffs

apparently made their banking and financial records available to the Defendants, the Defendants

did not review those records, interview the Plaintiffs or investigate the Plaintiffs in any way.

None of the Plaintiffs contested the jeopardy assessments as provided for in the New Mexico Tax

Administration Act nor did any of the Plaintiffs pay any amount of the jeopardy assessments.  The

Defendants subsequently issued regular tax assessments against the independent gasoline

distributors who were doing business with Gasplus through the Gasplus management agreement.

On February 15, 2002, Defendant Bejarano wrote a letter to Plaintiffs as follows:

At the behest of Governor Talache, the Department agrees to forestall any further action, including drastic collection measures, to enforce the jeopardy assessments issued by the Department against you.

The Department will honor Governor Talache's request on two conditions.  The first condition is that you will do nothing to interfere with the Department's review and audit of the books, records, and reporting of Nambé Pueblo Development Corporation, dba Nambé Gas.  The second condition is that your personal financial records be made immediately available to Department audit staff.

Apparently, the TRD had also independently concluded that it would not levy on the Plaintiffs' assets.  In addition, as noted previously, the Plaintiffs had already made their financial records available to the TRD.

After the TRD completed its audit of the Gasplus books, TRD staff informed Defendant Ellington "that there was no evidence in the records of Gas Plus that money had been paid to any of the persons who signed the Gas Plus agreement with Mr. Newton's daughters."  Affidavit of T. Glenn Ellington at ¶27, filed Oct. 29, 2003.  TRD also determined that the Plaintiffs and Gasplus had not possessed any gasoline and therefore could not be distributors subject to the gasoline taxes.  Consequently, TRD staff recommended to abate the jeopardy assessments.

Ms. Palmer signed the abatements on March 11, 2002.  The following day, Defendant Bejarano commented to Mr. Tuma that he preferred working with competent counsel as opposed to working with tribal counsel because tribal counsel made dealings with TRD difficult by raising tribal sovereignty issues.  Defendant Bejarano did not finally authorize the abatements of the Plaintiffs' jeopardy assessments until April 23, 2002, apparently two weeks after the Gasplus

jeopardy assessments were abated.[6]

The tax liens associated with the jeopardy assessments should have been released at the same time the jeopardy assessments were abated.[7] Defendant Bejarano, however, did not release the liens until July 1, 2003.  TRD's failure to release the liens was not discovered until Plaintiff Harold Porter began the process of financing the purchase of a home in Las Cruces in the summer of 2003.  Once Plaintiff Harold Porter's wife recorded the lien releases with the Santa Fe County Clerk's Office, Plaintiff Harold Porter was able to obtain the financing for the purchase of a home.  Plaintiff Harold Porter, however, continues to have credit problems because of the liens.  Plaintiff Perez has also had trouble selling real estate because of the liens.

The Plaintiffs bring this lawsuit under 42 U.S.C. §§1983, 1981, and 1982.  The Plaintiffs allege in their first §1983 claim that the Defendants violated Plaintiffs' Fourteenth Amendment rights by intentionally engaging in racial discrimination.  ¶40 of Second Amended Complaint (Doc. No. 79), filed February 24, 2004.  In addition, the Plaintiffs assert a §1983 claim based on the Defendants' alleged violation of Plaintiffs' right to procedural due process under the Fourteenth Amendment by not following the normal tax assessment and audit procedures.  *Id.* at ¶43.  The Plaintiffs also make a §1983 claim based on the Defendants' alleged violations of the

---

[6]Prior to April 2002, Defendant Lopez had many conversations with Governor Talache, at least weekly if not more frequently.

[7]Interestingly, Mr. Tuma states that Defendant Bejarano indicated to him on April 23, 2002 that no liens had been filed against the Plaintiffs and so their credit should not have been affected.  Ms. Palmer, however, indicated in her deposition that a notice of claim of tax lien was attached to each abatement.

Equal Protection Clause of the Fourteenth Amendment by engaging in conduct which "was arbitrary, capricious, motivated by ill-will and personal vindictiveness and had no legitimate governmental purpose" and which was motivated by the Plaintiffs' association with a particular faction of the Nambé Pueblo Tribal Council. *Id.* at ¶¶44 and 45. Furthermore, the Plaintiffs present a §1983 claim based on the Defendants' alleged violation of Plaintiffs' First Amendment right to associate with a particular faction of the Nambé Pueblo Tribal Council. *Id.* at ¶45. Finally, the Plaintiffs allege that the Defendants violated 42 U.S.C. §§1981 and 1982 by engaging in intentional race discrimination. *Id.* at ¶¶41 and 42. The Defendants argue that the Court should grant summary judgment because they are entitled to absolute immunity and qualified immunity.

B. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by

resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

C.  Discussion

    1.  Absolute Immunity

    The Defendants argue first that they are absolutely immune from suit because the issuance of jeopardy assessments is akin to a prosecutorial function.  State officials are entitled to absolute immunity if they "'perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings.'"  *Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000)(quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991)). Absolute immunity does not extend to primarily investigative or administrative actions unless those actions must be performed by a prosecutor in fulfilling his duty as an officer of the court. *Id.* (quoting *Pfeiffer*, 929 F.2d at 1490).

    In deciding whether a particular act of a government official is entitled to absolute immunity, the courts apply a functional approach which examines the nature of the government official's action.  *Malik v. Arapahoe County Dept. of Social Services*, 191 F.3d 1306, 1314 (10th Cir. 1999) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  "The more distant a function is from the judicial process, the less likely absolute immunity will attach."  *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990).  In the Tenth Circuit, a state official may enjoy only qualified immunity if the state official's actions were unilateral and occurred before the judicial process could begin.  *Id.* at 688-89 (citing *Spielman v. Hildebrand*, 873 F.2d 1377, 1383 (10th Cir. 1989)).  In other words, if the state official acts more like a law enforcement officer who investigates a situation and has a duty to intervene to prevent an injury, then the state official is

not entitled to absolute immunity and may enjoy only qualified immunity.  *Id.* at 689 (quoting *Hodorowski v. Ray*, 844 F.2d 1210, 1214 (5th Cir. 1988)).  The state official has the burden of showing that absolute immunity should apply.  *Id*. at 696 (quoting *Forrester v. White*, 484 U.S. 219, 223 (1988)).

In this case, the Defendants' actions occurred prior to the commencement of any court proceedings by either a state court judge or state administrative law judge.  Moreover, the Defendants obtained information which they contend compelled them to take unilateral action to prevent a possible harm to the tax revenues of the State of New Mexico.  These actions are akin to that of a law enforcement officer who after an investigation unilaterally decides to arrest a suspect before the suspect can inflict further harm.  Under these circumstances, absolute immunity is not available to the Defendants.

2.  §1983 Claims[8]

a.  Equal Protection Claim:  Class of One

As an initial matter, the Plaintiffs correctly note that the Defendants did not move for summary judgment with respect to the equal protection claim stated in ¶44 of the Second

---

[8]The Defendants argue that the element of causation is lacking as to Defendants Burleson, Bejarano, Lopez and Fergeson with respect to the §§1983, 1981, and 1982 claims.  "Section 1983 does contain a causation requirement."  *Wright v. City of St. Francis, KS*, 95 Fed. Appx. 915, 929 (10th Cir. 2004).  That causation requirement "may be satisfied if the defendant's conduct was 'a substantial factor in bringing [the injury] about.'"  *Id.* (quoting *Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996)(internal quotation marks omitted).  The conduct of Defendants Fergeson, Bejarano, and Lopez was a substantial factor in Defendant Ellington's decision to issue the jeopardy assessments.  Furthermore, Defendant Burleson actually issued the jeopardy assessments.  In addition, Defendant Bejarano's actions resulted in the late abatements and releases of liens.  Consequently, the evidence demonstrates that the Plaintiffs satisfied the causation requirement for a §1983 claim.  Assuming, without deciding, that §§1981 and 1982 have a similar causation requirement, the Court likewise finds that the Plaintiffs have produced sufficient evidence of causation for all of their claims.  The Court will, therefore, proceed to address the Defendants' other arguments in favor of summary judgment.

Amended Complaint.[9]  That equal protection claim alleges that the Defendants' conduct "was arbitrary, capricious, motivated by ill-will and personal vindictiveness and had no legitimate governmental purpose."  This type of equal protection claim is known as a "class of one" equal protection claim.  The Plaintiffs, nonetheless, have presented an argument that summary judgment should not be granted as to this particular equal protection claim and Defendants have now argued to the contrary.

The United States Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  The Tenth Circuit has held that to prevail on a class of one equal protection claim, a plaintiff must show (a) "that the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any legitimate state objective," and (b) that the plaintiff "was treated differently than another who is similarly situated."  *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1149 (10th Cir. 2001)(internal quotations and citations omitted).[10]

The Plaintiffs allege that the Defendants' actions were "wholly unrelated to any legitimate state objective" because the actions were based on the following:  Defendants' dislike of Mr.

---

[9] At the June 23, 2004 hearing, counsel for Defendants acknowledged that at the time he filed the motion for summary judgment, he did not understand Plaintiffs to be asserting a "class of one" equal protection claim in ¶ 44.  Plaintiffs made this clear in their response to the motion for summary judgment.

[10]The Plaintiffs cite to *Cobb v. Pozzi*, 363 F.3d 89 (2nd Cir. 2004) for the proposition that whether the Defendants' actions were objectively reasonable is a question for the jury in a class of one equal protection situation.  *Cobb*, however, does not set forth the class of one equal protection law as adopted and applied in the Tenth Circuit.

Newton, Defendant Ellington's desire to assist Governor Talache, the Defendants' desire to inspect the Plaintiffs' financial records, and Defendant Bejarano's remark that Plaintiffs should retain non-tribal legal counsel.  A reasonable juror could find that Defendants were justified in distrusting Mr. Newton because of the "bump and run" scheme he previously ran at Santo Domingo Pueblo.  Moreover, the evidence indicates that Defendant Ellington decided to assist Governor Talache because he was concerned about Nambé Pueblo having any dealings with a company run by Mr. Newton's family and BIA's questions as to the legality of the Gasplus management agreement.  In addition, the evidence shows that the Defendants were not particularly interested in examining the Plaintiffs' financial records because they did not examine them after gaining access to them following service of the jeopardy assessments.  Finally, the fact that Defendant Bejarano would have preferred for the Plaintiffs to be represented by a competent attorney instead of by tribal legal counsel reflects Defendant Bejarano's opinion of the quality of tribal legal counsel and does not necessarily reflect his opinion of the Plaintiffs.  Although a reasonable juror might find that Defendant Ellington was perhaps negligent in issuing the jeopardy assessments and that Defendant Bejarano was negligent by not abating the jeopardy assessments and releasing the liens in a more timely manner, "[t]here simply is no concrete evidence of a 'campaign of official harassment directed against [Plaintiffs] out of sheer malice.'"  *See Bartell*, 263 F.3d at 1149 (citation omitted).  *See also Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1191-92 (10th Cir. 2003)("It is hornbook constitutional law that mere negligence or mistake resulting in uneven application of the law is not an equal protection violation."); *Medina*, 252 F.3d at 1133

(violations of state law, procedures, and regulations do not provide a basis for a §1983 claim).[11]

The Plaintiffs further assert that they were treated differently than the independent non-Native American gasoline distributors who were merely audited.  This assertion, however, fails to demonstrate that the Plaintiffs were treated differently than others similarly situated.  The gasoline distributors were not signatories to the Gasplus management agreement and their role in the Gasplus management agreement was not the same as that of the Plaintiffs.  Consequently, a reasonable juror could not conclude that the gasoline distributors were similarly situated to the Plaintiffs.   Mr. Newton's daughters, however, were similarly situated to the Plaintiffs since they were also signatories to the Gasplus management agreement.  The TRD served jeopardy assessments on Mr. Newton's daughters like the jeopardy assessments served on the Plaintiffs.  The TRD also abated the jeopardy assessments against Mr. Newton's daughters for the same reasons the TRD abated the jeopardy assessments against the Plaintiffs, albeit the Gasplus jeopardy assessments were apparently abated two weeks prior to abatement of the Plaintiffs' jeopardy assessments.   The TRD, therefore, did not treat the Plaintiffs and Mr. Newton's daughters in a significantly different manner.  Consequently, since the issue has been fully presented, summary judgment will be granted as to the Plaintiffs' class of one equal protection claim.

---

[11]Interestingly, the Defendants did not personally or otherwise know the Plaintiffs when Defendant Ellington authorized the issuance of the jeopardy assessments.  All the Defendants knew about the Plaintiffs was that they had signed the Gasplus management agreement.

>    b.  Equal Protection Claims:  Discrimination Based on Race and Association with a
>    Particular Pueblo Faction

The Defendants argue that they are entitled to qualified immunity on the Plaintiffs' other

claims.  Summary judgment motions involving a qualified immunity defense are determined

somewhat differently than other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472,

1475 (10th Cir. 1995). "When a defendant raises the qualified immunity defense on summary

judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*,

207 F.3d 1202, 1206 (10th Cir. 2000).   This is a heavy burden for the plaintiff. *Medina v. Cram*,

252 F.3d 1124, 1128 (10th Cir. 2001)(citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th

Cir. 1995)).  "'First, the plaintiff must demonstrate that the defendant's actions violated a

constitutional or statutory right. Second, the plaintiff must show that the constitutional or

statutory rights the defendant allegedly violated were clearly established at the time of the conduct

at issue.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1534-35).  If, and only if, the

plaintiff establishes both elements of the qualified immunity test does a defendant then bear the

traditional burden of showing "'that there are no genuine issues of material fact and that he or she

is entitled to judgment as a matter of law.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d

at 1535).  In other words, although the court "review[s] the evidence in the light most favorable

to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy

two-part burden; otherwise the defendants are entitled to qualified immunity." *Cram*, 252 F.3d at

1128 (citation omitted).

"In determining whether the right was 'clearly established,' the court assesses the

objective legal reasonableness of the action at the time of the alleged violation and asks whether

'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing

violates that right.'" *Cram*, 252 F.3d at 1128 (quoting *Wilson v. Layne*, 526 U.S. 603, 615

(1999)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme

Court or Tenth Circuit decision on point, or the clearly established weight of authority from other

courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of*

*Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). The plaintiff, however, "is not required to show

that the very conduct in question has previously been held unlawful." *SH. A. ex rel. J. A. v.*

*Tucumcari Mun. Schools*, 321 F.3d 1285, 1287 (10th Cir. 2003). The plaintiff is

> required to demonstrate the unlawfulness was "apparent" in light of established law.
> Generally, this requires that the plaintiff demonstrate a "substantial correspondence
> between the conduct in question and prior law allegedly establishing that the defendant's
> actions were clearly prohibited."

*Id.* (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255-56 (10th Cir. 1998)).

The Defendants argue first that they are entitled to qualified immunity with regard to the

Plaintiffs' equal protection claims based on race discrimination and association with a particular

Pueblo faction. To demonstrate an equal protection claim, a plaintiff must show that the

government treated him differently than others who were similarly situated. *See City of Cleburne*

*v. Cleburne Living Center*, 473 U.S. 432 (1985). Moreover, the plaintiff has the burden of

demonstrating "objectively invidious discrimination." *See Roe*, 329 F.3d at 1192 (quoting *Bray v.*

*Alexandria Women's Health Clinic*, 506 U.S. 263, 269-70 (1993)). The term "invidious" is

defined as "'tending to excite odium, ill will, or envy, likely to give offense; esp., unjustly and

irritatingly discriminating." *Id.* (quoting *Bray*, 506 U.S. at 274).

As already discussed with respect to the class of one equal protection claim, the evidence demonstrates that the Plaintiffs were not treated in a significantly different manner than others similarly situated.  The Plaintiffs, however, argue that the issue of whether the independent gasoline distributors were similarly situated to the Plaintiffs is a question of fact to be determined at trial.  Issues of qualified immunity are normally questions of law decided prior to trial.  *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003).  Under special circumstances when historical facts are so intertwined with the law, a jury question can exist in the qualified immunity context if there is "a disputed issue of material fact concerning the objective reasonableness of the defendant's actions...."  *Id.* at 1007, 1010.  In other words, the jury can in exceptional circumstances address the second prong of the qualified immunity test. In this case, the issue of whether the independent gasoline distributors are similarly situated to the Plaintiffs is relevant to the first prong of the qualified immunity test which concerns whether the Defendants violated the Plaintiffs' constitutional rights.

The Plaintiffs also argue that there is direct evidence of racial animus by Defendants Bejarano and Fergeson as well as inferred racial animus.[12]  The Plaintiffs further argue that the Defendants' explanations for their actions are merely pretextual.  The Plaintiffs' direct evidence of discrimination consists of three statements.  First, Defendant Bejarano made a statement to Mr. Tuma regarding his preference for non-tribal lawyers.[13]  Second and third, Defendant Bejarano

---

[12]The Plaintiffs do not address the Defendants' argument that the equal protection claim based on factional favoritism is likewise subject to summary judgment based on qualified immunity.

[13]The record does not indicate whether the tribal lawyers were Native Americans.  At the June 23, 2004 hearing, counsel for Plaintiffs said he did not know if they were, or were not, Native Americans.

and Defendant Fergeson, respectively, made statements about the difficulty in dealing with Pueblo members because of tribal sovereignty issues.   "[S]tatements of personal opinion, even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999).  These statements, therefore, do not constitute direct evidence of racial animus.

Next, the Plaintiffs argue that racial animus can be inferred because the Defendants did not follow established procedures, the Defendants did not adequately investigate the Gasplus situation prior to issuing the jeopardy assessments, and the Defendants proffered inconsistent explanations for their conduct.  Viewing the evidence in the light most favorable to the Plaintiffs and accepting that these arguments are indeed valid, the Court concludes that the record simply does not provide clear evidence of "objectively invidious discrimination."[14]  In sum, the Plaintiffs have not carried their heavy burden of satisfying the first prong of the qualified immunity test applied in summary judgment situations.  Consequently, the Defendants are entitled to qualified immunity on the equal protection claims based on racial discrimination and factional favoritism.

### c.  Procedural Due Process Claim

The Plaintiffs contend in ¶43 of the Second Amended Complaint that they were deprived of property without an opportunity for a hearing when Defendant Ellington unlawfully directed the issuance of the jeopardy assessments, the Defendants threatened drastic collection actions, and Defendant Bejarano failed to release the liens immediately after the jeopardy assessments were abated.  The Plaintiffs clarify this claim in their response brief by alleging that the Defendants

---

[14]The Plaintiffs also contend that the issue of racial animus is a jury question.  However, as already discussed above, the issue of racial animus is decided as a matter of law in the qualified immunity context.

failed to provide notice and an opportunity to challenge Defendant Bejarano's failure to release the liens for a period of 15 months.

The due process clause of the Fourteenth Amendment provides that no state will "deprive any person of life, liberty, or property, without due process of law...." "[T]he temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection." *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991). An "essential principle of due process [is] that a deprivation of property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)(citation, alterations, and internal quotation marks omitted).

In this case, the TRD issued notices of the liens on February 11, 2002. Even if the Plaintiffs did not receive the notices of the liens, the February 11, 2002 jeopardy assessments stated that the "State of New Mexico has a lien upon all your property and rights to the property by reason of this document....." On April 23, 2002, Defendant Bejarano abated the jeopardy assessments. According to Ms. Palmer, a notice of claim of tax lien was attached to each abatement. At no time between February 11, 2002 and April 23, 2002 did the Plaintiffs protest the jeopardy assessments or liens as provided for in the New Mexico Tax Administration Act. NMSA 1978, §7-1-59(D)(1965) states that "[a] taxpayer to whom a jeopardy assessment has been made may dispute the jeopardy assessment either by furnishing security and otherwise following the procedures set forth in Section 7-1-24 NMSA 1978 or by paying the tax and claiming a refund as provided by Section 7-1-26 NMSA 1978." Had the Plaintiffs furnished some kind of security, they would have been entitled to a hearing. 1978 NMSA, §7-1-24(D). Clearly, the Plaintiffs were provided notice and an opportunity for hearing to protest the liens.

The Plaintiffs, however, note that on April 23, 2002, Defendant Lopez erroneously told Mr. Tuma that there were no liens to release.  Defendant Bejarano did not authorize the releases of the liens on April 23, 2002 because he also erroneously believed the releases would be executed automatically when he abated the jeopardy assessments.  "[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  The Plaintiffs have not presented evidence that Defendant Bejarano deliberately decided not to release the liens.  In fact, when Defendant Lopez was notified that the liens had not been released, he immediately informed Defendant Bejarano of that fact so that the liens could be released.  Since there is no clear evidence that the Defendants violated the Plaintiffs' right to procedural due process, the Defendants are entitled to qualified immunity on Plaintiffs' procedural due process claim.

d.   Substantive Due Process Claim

The Plaintiffs argue that their substantive due process rights were violated when Defendant Ellington decided to issue the jeopardy assessments, Defendant Bejarano delayed abating the jeopardy assessments for six weeks after the decision to abate the jeopardy assessments had been made, and Defendant Bejarano delayed releasing the liens for 15 months. The Tenth Circuit has stated the following with respect to substantive due process:

> An arbitrary deprivation of an individual's property right can violate the substantive component of the Due Process clause of the Fourteenth Amendment.  Any substantive due process claim must represent "more than an ordinary tort to be actionable under §1983," and must "shock the conscience."  To reach that level, the government action must be deliberate, rather than merely negligent.

*Clark v. City of Draper*, 168 F.3d 1185, 1190 (10th Cir. 1999)(citations omitted).  To satisfy the

"shock the conscience" standard, the "'plaintiff must do more than show that the government

actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government

power.'" *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998)(quoting

*Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)).  The plaintiff must instead "'demonstrate a

degree of outrageousness and a magnitude of potential or actual harm that is truly conscience

shocking.'" *Id.* (quoting *Ulrig*, 64 F.3d at 574).[15]  Moreover, "'where a particular Amendment

provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that Amendment, not the more generalized notion of substantive due

process, must be the guide for analyzing these claims.'" *County of Sacramento v. Lewis*, 523

U.S. 833, 842 (1998)(quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).

 In this case, the Plaintiffs' substantive due process claim mirrors their "class of one" equal

protection claim which alleges that the Defendants' conduct was "arbitrary, capricious, motivated

by ill-will and personal vindictiveness and had no legitimate governmental purpose."  ¶44 of

Plaintiffs' Second Amended Complaint.  Consequently, the Plaintiffs' substantive due process

claim is more appropriately analyzed under the "class of one" equal protection claim.  Even if the

substantive due process claim should be analyzed on its own merits, the Plaintiffs have not

---

 [15]The Plaintiffs appear to argue that based on a Third Circuit decision a deliberate
indifference standard should be used in this case to determine whether the Defendants violated the
Plaintiffs' right to substantive due process.  "The law recognizes a constitutional violation based
on deliberated indifference where defendants create a dangerous situation, enjoy the luxury of
making an unhurried judgment, have the chance for repeated reflection largely uncomplicated by
competing obligations, and nevertheless take action which at 'best sanction[s], at worse intend[s]'
Plaintiff's injury."  *Sherwood v. Oklahoma County*, 42 Fed. Appx. 353, 359 (10th Cir. 2002).
Since this lawsuit does not present a "danger creation" theory, the deliberate indifference standard
does not apply to the substantive due process analysis.

presented clear evidence that Defendants Ellington and Bejarano's conduct meets the "shocks the conscience" standard.  At most, the evidence indicates negligence on the part of Defendants Ellington and Bejarano.  In addition, although the evidence demonstrates that Defendants Ellington and Bejarano's actions were probably made in error, the evidence does not support a finding that the Defendants' actions were arbitrary.  *See Ulrig*, 64 F.3d at 573 (incorrect or ill-advised decisions by government officials do not implicate the due process clause).  There simply is no clear evidence that Defendants Ellington and Bejarano violated the Plaintiffs' right to substantive due process.  The Defendants are, therefore, entitled to qualified immunity on the substantive due process claim.

### e.  First Amendment Claim:  Freedom of Association

The Plaintiffs argue that the Defendants retaliated against the Plaintiffs because they voted in the tribal council to contract with Gasplus to manage Nambé Pueblo's gas distribution business and they opposed the election of the Talache/Yates faction at the end of 2001.  To allege a violation of the First Amendment right to association when the defendant is not the plaintiff's employer and there is no contractual relationship between the plaintiff and defendant, the plaintiff must show "(1) that the plaintiff 'was engaged in constitutionally protected activity'; (2) that the defendant's actions caused the plaintiff 'to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the 'defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.'"  *Mimics, Inc. v. Village of Angel Fire*, 277 F.Supp.2d 1131, 1140 (D.N.M. 2003)(quoting *Worrell v. Henry*, 219 F.3d 1197, 121 (10th Cir. 2000)).  *See also McCormick v. City of Lawrence, Kansas*, 253 F.Supp.2d 1156,1168-69 (D. Kan. 2003)(applying *Worrell* standard to right of association cases).

The Plaintiffs' participation in voting to contract with Gasplus to manage the Nambé Pueblo gasoline distribution enterprise and the Plaintiffs' political opposition to Governor Talache are political activities protected by the First Amendment.  *See Mimics, Inc.*, 277 F.Supp.2d at 1143 ("'political belief and association constitute the core of those activities protected by the First Amendment'" (quoting *Elrod v. Burns*, 427 U.S. 347, 356 (1976)).  The issuance of the jeopardy assessments, the delay in abating the jeopardy assessments, and the delay in releasing the liens, caused the Plaintiffs to endure harm to their credit records.  This type of harm could arguably chill a person of ordinary firmness from continuing to engage in tribal politics.  An issue arises, however, with respect to whether the Defendants' actions were "substantially motivated as a response to the [Plaintiffs'] exercise of constitutionally protected conduct."

To determine whether a defendant's actions were "substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct," the Tenth Circuit "has set forth a test for examining the issue of intent in the context of a summary judgment motion based on qualified immunity."  *McCook v. Springer School Dist.*, 44 Fed. Appx. 896, 905 (10th Cir. 2002).  First, the defendant "must make 'a prima facie showing of the objective reasonableness of the challenged conduct.'"  *Id.* (quoting *Seeds v. Lucero*, 177 F.Supp.2d 1261, 1270 (D. N.M. 2001)).  If the defendant succeeds in meeting his burden of showing objective reasonableness, then the plaintiff has the "burden of presenting evidence Defendants 'acted on the basis of a culpable subjective state of mind.'"  *Id.* (quoting *Seeds*, 177 F.Supp.2d at 1270)(internal quotation marks omitted).

In this case, there is a question of material fact as to whether the Defendants acted in an objectively reasonable manner. The Defendants were not obliged to make a reasonable

investigation prior to the issuance of the jeopardy assessments once Defendant Ellington had

reason to believe that the Plaintiffs would jeopardize the collection of taxes.  *See Wybierala v.*

*Commissioner of Revenue*, 587 N.W.2d 832, 835 n.5 (Minn. 1998).  There is, however, a

question of material fact as to whether Defendant Elllington had sufficient reason to believe that

the Plaintiffs would jeopardize the collection of taxes.  For instance, the following facts when

considered under the totality of the circumstances could lead a reasonable juror to find that the

Defendant Ellington acted in an objectively unreasonable manner when he decided to issue the

jeopardy assessments upon the advice of Defendants Fergeson, Bejarano, and Lopez:  Defendant

Ellington's desire to unilaterally aid Governor Talache when Defendant Ellington was aware of

political factionalism at Nambé Pueblo, Defendant Ellington's use of jeopardy assessments to

access the Plaintiffs' financial records when other means were available to attain that goal,

Defendant Ellington's quick decision to enter into a Joint Powers Agreement with Governor

Talache without investigating Nambé Pueblo's confidentiality protections, Defendant Ellington's

refusal to fully comply with Plaintiff Harold Porter's request to audit the Nambé Pueblo gasoline

distribution business run by Mr. Yates, the Defendants' failure to follow their own procedures in

issuing the jeopardy assessments, the Defendants' decision to issue regular tax assessments

against the independent gasoline distributors, and Defendant Lopez's many contacts with

Governor Talache prior to April 2002.  Moreover, a reasonable juror could find that the time lag

in approving the abatements and the actual abatements was not objectively reasonable.  In

addition, a reasonable juror could find that the failure to release the liens immediately upon the

abatements of the jeopardy assessments was likewise not objectively reasonable.  For these

reasons, the Defendants are not entitled to qualified immunity on the Plaintiffs' First Amendment

claim.

    3.  §1981 Claim

The Defendants argue that their §1983 qualified immunity defense applies to the §1981

claim based on intentional racial discrimination.  The Defendants also argue, in the alternative,

that §1981 does not apply to state actors. A defendant can raise a qualified immunity defense to a

§1981 claim.  *See Ramirez v. Department of Corrections, Colo.*, 222 F.3d 1238 (10th Cir. 2000).

To establish a §1981 claim the plaintiff must present evidence of  "'a prima facie case and present

evidence that the defendant's proffered non-discriminatory reason was pretextual--i.e., unworthy

of belief.'"  *Sampson v. Norwest Financial, Inc.*, 1996 WL 463997 *2 (10th Cir.)(quoting *Randle*

*v. City of Aurora*, 69 F.3d 441, 452-53 n.17 (10th Cir. 1995)).  To establish a prima facie case

under §1981, the plaintiff must show "(1) an intent to discriminate on the basis of race by

defendant; and (2) the discrimination concerned one or more of the activities enumerated in the

statute."  *Id*. (citations omitted).[16]  As already discussed above, the Plaintiffs were unable to

provide direct evidence of intent to discriminate against the Plaintiffs based on their race.

Moreover, the Plaintiffs have not presented evidence that the Defendants' proffered non-

discriminatory reasons for acting as they did were pretextual in nature.  Instead, the Plaintiffs'

evidence tends to show mere negligence on the part of the Defendants.  Finally, even if the

Plaintiffs demonstrated discriminatory intent, the Plaintiffs have failed to explain how §1981

---

[16]Section 1981 provides:  "All persons within the jurisdiction of the United States shall
have the same right in every State and Territory to make and enforce contracts, to sue, be parties,
give evidence, and to the full and equal benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens, and shall be subject to like punishment,
pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

applies to the Defendants' actions.  The Defendants are, therefore, entitled to qualified immunity with respect to the Plaintiffs' §1981 claim.

Having found that the Defendants are entitled to qualified immunity regarding the Plaintiffs' §1981 claim, the Court finds that it is unnecessary to decide whether §1981 applies to state actors.  In fact, there is a circuit split as to whether the 1991 amendments to §1981 overruled *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 733 (1989) which held that §1981 does not apply to state actors.  *Burns v. Board of County Commissions of Jackson County, Ks.*, 330 F.3d 1275, 1288 n.10 (10th Cir. 2003).  The Tenth Circuit has not decided that issue. *Id*.

4.  §1982 Claim

The Defendants likewise argue correctly that Plaintiffs' §1982 claim is subject to a qualified immunity defense.  *See* Ivan E. Bodensteiner & Rosalie Berger Levinson, 2 *State and Local Government Civil Rights Liability* §3:10 (2002)(government officials sued individually under §§1981 and 1982 may be entitled to the same immunity defenses provided under §1983). As with a §1981 claim, a §1982 claim requires discriminatory intent based upon race.[17]  *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989).  If a plaintiff can show an intent to discriminate on the basis of race in order to interfere with the plaintiff's property rights, the plaintiff next must demonstrate that the defendant's proffered non-discriminatory reasons were pretextual.  *Id*.  For the same reasons the Defendants are entitled to qualified immunity with

---

[17]Section 1982 states:  "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

respect to the §1981 claim, the Defendants are also entitled to qualified immunity with respect to the §1982 claim.

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. No. 92) is denied as to Plaintiffs' First Amendment claim, but is granted as to all of the Plaintiffs' other claims, which will be dismissed with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE